Good morning, your honors. Vinay Chai for the petitioner. If I may reserve two minutes for rebuttal if necessary. I think this case basically raises two issues. First, that of credibility. And second, that of discretion. In particular, whether it's an abuse of discretion to deny an otherwise credible asylum application simply on the basis of marriage fraud. First, as to credibility, the IJ in this case found the petitioner incredible basically for three reasons. First of all, plausibility. He had difficulty visualizing certain aspects of his testimony. In particular, his testimony about how the militants who visited his home in June of 1994 had behaved. That amounts basically to conjecture, and I don't think that can support an adverse credibility determination. He had the facts straight up wrong as well. The petitioner's clear testimony was that basically that some of the militants started to take the mother's jewelry, but that the leader actually told them to hold off on it. The IJ, on the other hand, thought that the jewelry had been taken and then somehow returned, which simply didn't happen. So apart from being conjecture, it's conjecture that's not supported by the record. Second, the only inconsistency the IJ cited in the petitioner's testimony was that between his testimony and an affidavit he had submitted by his mother. Specifically, the mother's affidavit seemed to indicate in somewhat broken English that a bribe had been required to secure a petitioner's release after both of his arrests. Petitioner, on the other hand, basically testified that if they needed to bribe the police to get me released at any time, they didn't tell me about it. And I think given that his state after his second arrest was such that he required four months of hospitalization, I think that was a quite, it's reasonable, if not, it's more reasonable to assume that they wouldn't, to expect that his parents wouldn't burden him with that. That's the only inconsistency the IJ hung his hat on in this case. I, in light of that, I think the requirement of corroboration here was improper. Notwithstanding the fact that it was difficult corroboration to obtain and petitioner attempted to provide a bribe. He did provide an affidavit from his, or did submit an affidavit from his mother indicating that she had tried but had been unable to obtain records of his hospital stay. The third reason, and I think really what ended up being the overriding reason for the denial in this case, was the marriage fraud issue. Our weaker argument, frankly, is that the facts don't support marriage fraud. It's a close issue. The facts could reasonably support marriage fraud. The stronger argument is that regardless of that, that's fairly irrelevant to his fear for seeking, his fear for safety and his reasons for seeking asylum. The government cites INRE OD, a BIA decision, and Akinmare V. INS, a decision by this court, as support for the argument that it was proper for the IJ to consider the marriage fraud issue in finding respondent incredible. But both of those cases explicitly distinguish between fraudulent documents submitted for the purpose of bolstering an asylum application and fraudulent documents submitted in other immigration-related contexts. And this clearly, the marriage fraud, if there was a marriage fraud here, it wasn't for the purpose of bolstering an asylum application. And to the extent that it would reveal anything about his fear for safety or his fear of returning to India, I think it's consistent with that. So for all of those reasons, I think the at-risk credibility determination here is unsupported. The marriage fraud was proven by a declaration from... It was, yeah, at page 191 of the administrative record. It's a handwritten affidavit by Dawn Jenkins, petitioner's... Well, actually, she was still his wife at the time of the hearing. They had not actually divorced at that time. And basically what that affidavit said was that a friend of a friend or an associate of an associate of petitioners said that there's immigration laws coming into effect and he might be willing to pay $6,000 for a marriage. And it also says that later on, after a petition... But there was an objection. What's that? There was an objection on a hearsay grounds. Absolutely. And I think a valid one, simply in that this is a United States citizen. He was here and could have been asked to come and wasn't. Exactly. I believe the I.J. basically said, look, we're submitting all this hearsay from the respondents, so what's fair for one side or the petitioner, so what's fair for one side is fair for the other. But, of course, the distinction is that the potential witness the government didn't submit is not only a U.S. citizen, but someone who last we knew lived in Northern California. And the petitioner didn't know about this until it was... No, he had not known that the petition had been withdrawn until basically the day of the hearing. Had no reason to call her because he didn't know it was going to come up. Exactly. So there's a definite element of unfair surprise. And it really ended up being the overriding element in the case, because basically the judge said, even assuming Alien's credible, I'll deny on the marriage fraud. And our position is that's simply not egregious enough a factor, an adverse factor, to warrant denial, assuming that the petitioner is credible. What does marriage fraud have to do with political persecution? I would submit absolutely nothing, Your Honor. But then we get to the discretionary issue. Exactly. But I think that the board's cases that I cited in my Rule 28A supplemental letter are, notwithstanding subsequent amendments to the Immigration and Nationality Act, still perfectly valid. That is, there has to be an explanation other than one sentence. There really should be. The danger of persecution should outweigh all but the most egregious adverse factors. And that some sort of totality of the circumstances test should be applied in determining whether a petitioner or an alien who should be found credible and has testified to past persecution should, as a matter of discretion, be denied asylum. So they need to consider all the circumstances, just not... I think so. I mean, strictly speaking, the language in Matter of Pula says the totality of circumstances of an alien who is in his actions to flee his country. But I think the logic and spirit of that statement would extend to consideration of the totality of the circumstances in considering the actions of an alien who is attempting to stay in a country or attempting to avoid being removed to the country in which he was persecuted. Okay. You want to save the rest of your time? Certainly not. All right. Good morning, Your Honors, and may it please the Court. My name is Jeffrey Bernstein, and I represent the Attorney General of the United States. I'm going to get to all of the evidence that counsel has discussed, but I'd like to begin by just reminding the Court that they can only vacate the adverse credibility finding if the evidence of record compels the conclusion that the credibility finding was erroneous. A review of the record reveals that there is no evidence compelling such a conclusion. And first, and this is very important, the adverse credibility finding was made in the context of a State Department report, which throws the petitioner's claims in doubt. The State Department report reveals that there's a high level of misrepresentation in the claims of Sikh asylum seekers, and it quoted some report where a review of asylum claims by Sikhs was made, and none of them was found, all of them were found to be misrepresented. So that's the context in which the immigration. Why that general statement that you just made to Mr. Singh here? I'm just telling you the context in which. Well, that's what you're saying, isn't it? Well. Because Sikhs in general make these fraudulent, there's indication that Sikhs in general make fraudulent applications. Therefore, Mr. Singh, in this case, probably, you know, it's likely that the whole thing is fraudulent. Well, that's what you're saying. I'm not saying that, Your Honor. And I'd like to explain myself. Again, that's the context in which the immigration judge found himself in, and it certainly emphasizes why even the slightest indication of testimonial dishonesty would cause serious concern. So you are arguing for some sort of a presumption arising out of the country conditions. I'm not arguing for presumption, Your Honor. I'm just telling you that you have to view the immigration judge. Why is that important, if you're not arguing for presumption? Because, as I said. Why don't you just look at what was in the record here with Mr. Singh? Your Honor, what I'm saying is you have to consider the context. Your time is evaporating here. Well, I'm trying to answer your question, Your Honor, and I apologize. Why don't you address the particular grounds on which the I.J. identified that challenged his credibility? Your Honor, I was intending to do so. I think I started off by saying so. And I apologize if you're upset with me. Let me point out again that you have to conclude that the evidence compels the finding that he was credible. Let me just point out. Do you disagree that, given everything, without the marriage fraud, there wouldn't be much here? No, I disagree with that completely. Again. Because I know it's going to ask you to focus on the marriage fraud, but go ahead. Okay. Again, evidence has to compel an opposite conclusion. You have a lot of evidence. You have evidence, number one, and I will get to the specific evidence, in the State Department report at page 202, that states that applicants who testified that militants who were active after 1993 are not credible. Mr. Singh testified that they were active in June and December of 1994. The State Department report at page 208 states that young male Sikh applicants who testified that they were arrested by police alone and not along with the senior male family members are not credible because the modus operandi of the police is always to arrest the senior male and all the young males in the family. Mr. Singh, of course, testified that in both instances that he was allegedly taken into custody, the father wasn't taken into custody. So that's, I think, certainly strong evidence in support of the immigration judge's adverse credibility determination. And, Your Honor, you indicated that you wanted to get to the marriage fraud. The marriage fraud, of course ---- Now, aren't you going to discuss any of the other supposed contradictions before we get to the marriage fraud? I'm happy to discuss anything you like, Your Honor. All right. Go ahead with the other contradictions first and then let's get to the marriage fraud. All right. Again, you have to remember the context in which this case arises in which even the slightest inconsistency has to give an adjudicator a pause. You said that a couple of times. Yes, I did. And I'm just trying to emphasize it, Your Honor. With respect to the AK-47 ---- What you're saying is that either you have to fight the ball and say you are arguing for a presumption because it appears that that's what you're doing and then we can discuss that, or it really isn't pertinent. I'm not arguing for a presumption, Your Honor. I'm not arguing for a presumption. All right. So go ahead. With respect to the AK-47 testimony, Mr. Singh testified essentially that three things caused him to know that they were using AK-47s. First, the petitioner that the militants, the alleged militants, demanded money and we are not moving around with this AK-47. And I presume they meant we are not fooling around with this AK-47. And then the petitioner testified that they said these are AK-47s we are carrying and we need money to buy them. And then finally, the immigration judge, still trying to clear up how he found out that they were carrying AK-47s, says so that he asks him again, and all he says is they were armed. So this is in the context of ---- And what's wrong with that is? What's wrong with it is ---- Was it awful they said that? I'm sorry? It's implausible? He was unable to give a ---- the immigration judge found that was an implausible, that his explanation that they would come in demanding money and say, you know, we're carrying AK-47s is implausible. And it is implausible. And that's why it's important to examine these perhaps smaller problems, because what happens in these cases is that the petitioners come and give a general story. And the fact that their general story is inconsistent is not ---- But here the problem seems to be not that it was too general, but it was too specific. The problem was not that it was too specific. The problem was that he was unable to give a plausible answer to how he knew they were carrying AK-47s. And it demonstrates that when he's presented with a question that doesn't fit in with the story that he's telling, he flails around for an answer and ultimately gives an implausible answer. The immigration judge also found that it was implausible that the desperate militants would come in with their bearing arms, ask for money and receive the answer that we don't have any money, and then decline to take the jewelry they demanded. And I've read the testimony, and I think the immigration judge gets the testimony right. I don't think he describes all the testimony, but he gets it right in its essence. You think that the testimony was that they took the jewelry and gave it back? The testimony, my recollection is that the testimony was that they demanded the jewelry and it's unclear whether or not the jewelry was handed over. Do you know where that is in the record? To be honest with you, Your Honor, I don't have a record reference for that. The fact that the mother's affidavit was in English and it was notarized in English when the mother doesn't speak English or write English and there was no evidence of a translation or a translator, he found it implausible that Mr. Singh burned the only documents which would have proved that he wasn't working with militants, the letters which allegedly the militants sent him. Well, just a second, counsel. This gentleman's story was that when he went to the police and told them about the house invasion, instead of saying thank you and we're going to use you as an informer and get these guys, the first thing he did was arrest them and beat them. Right. So, therefore, keeping anything which indicates any contact with these militants is not a good idea. Oh, I don't think so, Your Honor. I don't think so, Your Honor. Perhaps if he would have, you know, even accepting his story, perhaps if he would have gone there. And showed them these documents and said this is another reason to arrest you and beat you. No, show them letters that he was not working with the militants. His story is he came and complained about their visit and they suspected that he was working with them. If he would have had documents which established, well, no, I'm not working with them. They're threatening me because they say that, you know, I'm cooperating with the police. Why burn those documents? Again, this question came and asked him about matters which did not fit in with the story that he came in to tell. He was flustered, unable to give a proper answer, so he gave an implausible answer. And the immigration judge rightfully indicated that, thought that was an indicia of non-credibility. There's no corroboration for the hospital stay. And there's no indication in the record why Mr. Singh would have to stay in the hospital for five months with, as the person who read the x-ray determined, was a small fracture, a hairline fracture. There was his testimony that after five months of beatings almost every day in the first incident, the only medical care he received was, I believe, some herbal tea from his mother. And he also testified that they made him do laundry and mow the lawn during these five months. I mean, it seems hard to believe that if they were beating him every day, he would be in any condition to mow the lawn and do the laundry if, in fact — excuse me. And he testified on one occasion that he didn't live with his spouse, and then he testified that he did live with her in the same house, and then he testified that — That's just a marriage fraud. That's different. I'm sorry? That all goes to the marriage fraud issue. Well, it goes to the unbelievability of his testimony. I mean, counsel got up here and said, well, you can't — the immigration judge couldn't consider that because it didn't have anything to do with the events of his asylum claim. Well, that makes absolutely no sense at all. This is clear evidence, an attempt to obtain a benefit through fraudulent means or misrepresentations. I mean, this Court has concluded that such evidence bears on credibility. It would be absolutely — strikingly, absolutely crazy to think that an individual whose credibility is called into question, the fact of that question, if it doesn't relate — Well, we do have this line of cases that say — Akamadi, is that the main one? That say that fraud or lies to get into the country are not pertinent to an asylum. But that's completely different from here. Here he's already in the country. The basis for those — I mean, I agree it's a strange set of notions, but there is some logic to it, the logic being that if the person is trying — what we're trying to test is whether he has a well-founded fear of going back. The fact that he's doing some — he's committed some fraud to stay here doesn't implicate whether he's — Well, number one — excuse me, Your Honor, but number one, he came into the country. He got into the country. He's safe. He's got an asylum application. If he, you know — obviously, if he's got an asylum application, he can stay. What good — I mean, why should he — I mean, the only reason that I can think of — Obviously, he has an asylum application, but not if he — only if it succeeds. Well, I mean, then he doesn't have much faith in his asylum application, does he? The only reason I can think of to then go ahead and do marriage fraud because you're afraid to leave the country to go back to India is if you don't think you have a valid asylum application. And, in fact, the affidavit of the spouse indicates that she was never given the reason that he suggests in his brief for not wanting to go back — that he wanted to get married because he didn't want to go back. I haven't heard about that. There's a case, and I don't know if it was cited in the briefs, called Conadden v. INS from 1988, which is very similar in that an affidavit from a wife and a marriage fraud issue was submitted  And it was a case that was submitted by a spouse, and it was a case that was submitted by a husband or from a spouse, but hadn't been sort of known of before. And we held that that was not a fair use of hearsay. I'm familiar with the case, Your Honor. And I've got a number of responses to that. And the first response is, I don't believe that Mr. Singh raised that issue to the immigration — He did object on hearsay grounds. He objected to hearsay grounds. Isn't that the issue? He objected to hearsay grounds, but he did not say, well, I have — excuse me, I need the opportunity to cross-examine her. He didn't contest it on that basis. And even if he did — Is that exactly what a hearsay objection is? No, it's not, Your Honor. He said, one — A basis of hearsay is a lack of cross-examination. And he did say it anyway. Your Honor, I'm coming to object to the submission of this document. One, Ms. Jenkins is not here for us to cross-examine. Second, it's totally hearsay. Well, that — you're right. You remind me, Your Honor. But he didn't — he did not — he did not make that argument to the BIA, and he doesn't make that argument to you. So he's — either he's failed to exhaust it or he's waived it. But in any event — excuse me. This case is very different from the Kunin case for a number of reasons. And I think I have them listed here. Because, number one, Mr. Singh essentially validated whatever Ms. Jenkins said. He validated that he did not — that he married her to stay in the country, and he validated that he gave her money. He did not — certainly didn't say he gave her money to — to marry him. But the immigration judge could reasonably have presumed that that's, in fact, what happened. And, you know, he corroborated her assertion that she was paid. And he gives this really convoluted story about giving her money for the $2,000 for starting a business. And it's really difficult to understand exactly what he's saying in that regard. So he corroborated her on a number of levels. And he corroborated her on the fact that they never consummated the marriage and, again, married her to stay in the country. And there's — even absent that, this affidavit has lots of indices of reliability. And one of them, obviously, is that, as I've just said, part of the statement was validated by her testimony — by his testimony. And this is a statement against her penal interest. I mean, it's a — it's a violation of the law to marry — to marry somebody so they can stay in the country. But none of that deals with this case of errors, which — Well, I think it does, because I think — All the things you're saying now would have been true there as well. I don't think so, Your Honor. Well, being against your penal interest is exactly the same. Well, perhaps I don't remember tuning in, though. Well, it's — if it was against the penal interest for the wife here to say that she committed a marriage fraud, then it was against the penal interest for the wife there to say — I don't — I don't remember, Your Honor. I — it may well be distinguishable, but I certainly don't remember. In any event, the admission of the — of the affidavit was proper. He really didn't — although he made the objection at the immigration hearing, as you point out, he didn't raise the matter to the board, and he doesn't raise the matter here, so he's waived it. And I think that's it. The marriage fraud certainly, as this Court has held, an attempt to gain a benefit through artifice or fraud bears on credibility, and it would turn credibility analysis on its head to conclude that the Court couldn't consider that in an asylum case. I see that my time is well up. Thank you. But I just would want to close saying that he — with respect to the issue of denial of the asylum application as a matter of discretion, while the Petitioner kind of generally raised that argument in his brief, he didn't raise the specific argument that he's making now. And in any event, I would argue that the immigration judge implicitly weighed all the factors and determined that the immigration — But you do understand that there was a discretion, that he did make a discretionary decision. He did make a discretionary decision, yes, and that he considered it — and it was not an abuse of a discretion to consider the marriage fraud severe enough, combined with the questions, really, that he had about the gentleman's credibility and the questions that the State Department report raises with respect to whether or not conditions now in India are safe for seeks. I mean, it seems that the State Department reports in the record establish rather uncategorically that seeks are — that this conflict is over, that seeks are just fine, they're well represented in Indian society as a whole, they have Sikh representatives in national government. So given all that, the immigration judge did not abuse his discretion in denying the claim as a matter of discretion. Thank you, counsel. Thank you, Your Honor. Go ahead. Little bit of battle time. Your Honor, just in response to a few things, as to counsel's point that the specific — that some of the particular arguments regarding discretion were not made in the brief and were made here, I would just say that inasmuch as the Circuit Advisory Committee's notes to the Circuit Rules on Oral Argument instruct counsel not to belabor points adequately addressed in briefs, I think it's perfectly appropriate for me to bring up that specific additional argument regarding discretion. What was the specific additional argument? Just that whether or not the marriage fraud was properly proven. Even if the marriage fraud had been properly proven, it was still an abuse of discretion to, on that basis alone, deny if the credibility determination was flawed. Did you waive the hearsay issue by not raising it with the BIA? I believe that we did raise it, or prior counsel did raise it with the BIA, Your Honor. You're not certain? I'm — That's okay. I'm pretty certain. We can double-check. I can't give you a cite right now, but I'm pretty certain. You don't exactly raise it in your brief either, though. I mean, you raise it in your brief that it shouldn't have been taken — given much weight, but you don't argue it shouldn't have been admitted at all. Looking quickly, that was what I believed to be the case. Well, that may be true. I believe that I'll raise it now that I don't think it should have been admitted at all, and that I do think that it's appropriate for me to raise that now if I didn't in the brief, because I do believe it was brought up in the BIA brief. As to the plausibility issues, the burning of the documents, the government seems to think that that was some sort of — that would have been some kind of exculpatory evidence to hand to the police to say, here, I'm not involved with the Miltons. But those letters, according to Petitioner's testimony, accused him of being — of informing on us. So they, in a way, would have corroborated some sort of — they would have possibly corroborated some sort of relationship with these people and put him in more trouble than he had already been. As to the AK-47, I just don't really see what's implausible about his testimony on that. Let me ask you just one last question that I have. How do you respond to the government's argument that if you don't allow the IJs to take into account this subsequent event of fraud, marriage fraud, that it turns credibility, as he said, it turns credibility analysis on its head? I don't think it turns credibility analysis on its head at all. I just think it's — I think — Well, isn't the point that — People coming from other countries commit frauds of all kinds to get out of the country and stay in the country. Right, but why can't — why couldn't the IJs say, look, if he was willing to lie about the bona fides of the marriage, lie in declaration, after he got here and wasn't in any immediate danger, lie in official documents, commit — I mean, commit fraud, not only in the sense of committing a marriage that wasn't a bona fide marriage, but then filling out documents saying that it was. Therefore, I have every reason to believe that he's also going to stand up here and tell lies in order to stay in the country before me. Your Honor, I think that he — I think that the whole — I just think that the marriage fraud issue has to be viewed in light of the rest of his testimony. And, I mean, he, in fact, did testify regarding the marriage. He did say that a part of the reason he had done it was that he was afraid to go back. I think at page 144 of the administrative record. I just think there should be a clear — If this was a criminal trial, I guess we would have — I suppose that the marriage fraud would probably be admissible even as a prior conviction to impeach somebody because it was a crime concerning misrepresentation and fraud. Right? So despite the general rule against admitting prior bad acts, this would probably be admissible specifically for the purpose of demonstrating that the person is not a credible person. Well, Your Honor, I think that there's two things. One — well, the first thing is I think as counsel said himself in his time, his testimony more or less corroborated what that affidavit said. So I don't — so his ultimate testimony regarding what had happened was not — was not that far different from what the affidavit said. At this hearing, but at earlier points, he was obviously lying to the government about his marriage. Not just committing a fraudulent marriage, but lying to the government about it. I would simply argue that that's — that was an unfortunate lie made in a different immigration context, but in an attempt to remain in a country rather than — It wasn't in a different context. Picking up on what Judge Berzon said, in a criminal case, prior bad acts would not be admissible to show that he did a bad act on this occasion, but it wasn't being shown for that purpose. It was being shown it was part of a plan to stay in the country on whatever basis he could. And that might go to his credibility as to the other instances of him being a refugee or not. But I — but more than being a part of a plan just to stay in at any means necessary, I think it's more consistent with fear of returning to a country where you'd been persecuted. Well, those two ideas — He actually testified that that's why he got married. That's totally consistent, fear and plan. That is — that is — I think — I think it is in that way. Okay. Okay, thank you, counsel. The matter will be submitted, and the Court's going to take a five-minute recess.
judges: Paez, Berzon, Bea